ASHLAND SCHOOL DISTRICT,
Plaintiff–Appellant,

v.

PARENTS OF STUDENT E.H.,
Defendants–Appellees.

Civil No. 07–3019–CL.

United States District Court,
D. Oregon.

Aug. 26, 2008.

**1222**

Nancy J. Hungerford, Richard G. Cohn–Lee, The Hungerford Law Firm, Oregon City, OR, for Plaintiff–Appellant.

Mary E. Broadhurst, Mary E. Broadhurst, PC, Eugene, OR, for Defendants–Appellees.

## OPINION AND ORDER

PANNER, District Judge.

Plaintiff Ashland School District (the "District") brings this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i). The nominal defendant is a teenage student who, for privacy reasons, is referred to by the pseudonym E.H.[1]

On August 2, 2007, Magistrate Judge Clarke filed a Report and Recommendation ("R & R"). The Parents of E.H. ("Parents") timely objected. On September 24, 2007, Magistrate Judge Clarke withdrew the first R & R, and filed a second R & R. This time, the District timely objected. The matter is now before me for *de novo* review pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b).

### Legal Standards

Parents contend that a decision by the Administrative Law Judge ("ALJ") is reviewable only for abuse of discretion or "clear error." That is incorrect. *See Forest Grove School Dist. v. T.A.*, 523 F.3d 1078, 1084–85 (9th Cir.2008) ("no case supports T.A.'s contention that we review *the hearing officer's decision* for abuse of discretion") (emphasis in original).[2]

Rather, the standard of review in IDEA actions has been characterized as modified *de novo* review. *Katherine G. v. Kentfield School Dist.*, 261 F.Supp.2d 1159, 1167 (N.D.Cal.2003). *See also Seattle School Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir.1996), *abrogated in part on other grounds by Schaffer v.*

---

1. Because the attorney in an IDEA action usually represents the parents—whose objectives are not always congruent with the views articulated by the child—the court has revised the caption to reflect that the real parties in interest are the parents. A parent is a proper party in an IDEA action. *Winkelman v. Parma City School Dist.*, 550 U.S. 516, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007). The caption has been further modified in an effort to protect the identity of the student and the family, given the persistence and wide availability of electronic documents.

2. Parents also rely on *Parents of Student W. v. Puyallup*, 31 F.3d 1489, 1497 (9th Cir.1994). It is not on point. The deferential standard the Court of Appeals employs when reviewing a district court's decision granting or denying equitable relief is not necessarily the standard applied when this court reviews a decision by an administrative hearing officer under the IDEA.

*Weast,* 546 U.S. 49, 56–58, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). The reviewing court makes an "independent decision[ ] based on the preponderance of the evidence." *Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The court may thus decide questions of law and fact. The court is further authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). This language confers "broad discretion" on the district court. *Forest Grove,* 523 F.3d at 1084. However, courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034. Because the state is thought to have "specialized knowledge and experience," "due weight" is given to the ALJ's determinations, *id.* at 208, 102 S.Ct. 3034, with greater deference to findings that are "thorough and careful." *Capistrano Unified School Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995).

■ The School District, as the party challenging the administrative decision, bears the burden of persuasion. *See Schaffer,* 546 U.S. at 56–58, 126 S.Ct. 528; *Ms. S. v. Vashon Island School Dist.,* 337 F.3d 1115, 1127 (9th Cir.2003) ("In the district court … the burden of proof is on the party challenging the administrative ruling").[3]

The IDEA provides federal funding to assist states in educating the disabled, but conditions such funding on compliance with specific goals and procedures. *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1469 (9th Cir.1993). One such procedure is the formulation and implementation of an Individualized Education Program ("IEP"). Each disabled child must have an IEP, formulated by a team that includes the child's parents, teachers, district representatives, and other relevant personnel. 20 U.S.C. § 1414(d).

■ The IDEA contemplates that children with disabilities ordinarily will be educated alongside children who are not disabled. Special classes, separate schooling, or other removal of disabled children should occur only when the nature and severity of the disability is such that education in a regular classroom environment cannot be satisfactorily achieved. 20 U.S.C. § 1412(a)(5)(A).

### Background

Only facts and procedural history necessary to this decision are stated. At various times, E.H. attended a District school. On other occasions, E.H. was in non-District facilities or remained at home. While E.H. was "homebound" the District provided a tutor, although E.H. was not always able or perhaps willing[4] to utilize that service. In January 2005, Parents sent E.H. to an out-of-state private "residential" facility. Parents did not first inform the District that they were rejecting the existing District IEP. The District did know that E.H. had left the state. In June 2005, Parents transferred E.H. to a different facility operated by the same company.

On or about September 8, 2005, Parents sought reimbursement from the District of $34,211 for fees[5] charged by the private

---

**3.** *Schaffer* abrogated the prior sentence in *Vashon Island* (which read "At the administrative hearing, the school district has the burden of proving that it complied with the IDEA.")

**4.** For purposes of the issues addressed in this opinion, it does not matter which.

**5.** Parents and the ALJ refer to these costs as "tuition." I prefer not to use that term, as it may or may not adequately convey the true

facilities and related costs. Parents also asked the District to prospectively fund this "placement," *i.e.*, pay the continuing cost of keeping E.H. at a private facility. The District rejected the demand for reimbursement of Parents' past expenses, but offered to convene an IEP Team meeting to prepare a new IEP for E.H. The District IEP Team met on December 6, 2005. The Team concluded that "residential placement" was not necessary for educational reasons, and that Parents' proposed placement was not the "least restrictive environment" that would permit E.H. to receive an education. The IEP Team proposed a different placement, which was still in the public school system but outside of the regular classes. Parents rejected that offer.

On January 26, 2006, Parents requested a "due process" hearing. The parties then engaged in extensive briefing and argument. Voluminous exhibits and testimony were received during four days of hearings. On January 2, 2007, the ALJ filed his decision. The District was ordered to reimburse Parents for one-half the expenses (with a few adjustments) that Parents incurred for the out-of-state facilities from January 2005 until September 18, 2005, and all expenses (with a few adjustments) that Parents incurred after September 18, 2005.

The District appeals that decision on various grounds. The Magistrate Judge recommended that the decision of the ALJ be reversed because Parents' failure to comply with the IDEA'S notice requirement bars their claim for reimbursement. Parents timely object to that recommendation. Also pending is Parents' motion for "interim relief."

---

nature of a particular facility. Additionally, whether the child is residing at the private facility to receive an education, or for other

## *Discussion*

### A. *Whether Failure to Give Notice Categorically Bars A Claim for Reimbursement*

■ Congress amended the IDEA during the time period relevant to this action. From June 1997 until July 1, 2005, 20 U.S.C. § 1412(a)(10)(C) provided that:

\*     \*     \*

(ii) If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

(iii) Limitation on reimbursement

The cost of reimbursement described in clause (ii) may be reduced or denied—

(I) if—

(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(bb) 10 business days (including any holidays that occur on a busi-

---

reasons, is often a central issue in IDEA cases. Characterizing the cost as "tuition" may appear to prejudge that question.

ness day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in division (aa);

(II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(7) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

(iv) Exception.

Notwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement may not be reduced or denied for failure to provide such notice if—

(I) the parent is illiterate and cannot write in English;

(II) compliance with clause (iii)(I) would likely result in physical or serious emotional harm to the child;

(III) the school prevented the parent from providing such notice; or

(IV) the parents had not received notice, pursuant to section 1415 of this title, of the notice requirement in clause (iii)(I).

In 2004, Congress revised § 1412(a)(10)(C)(iv) to read:

(iv) Exception

Notwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement—

(I) shall not be reduced or denied for failure to provide such notice if—

(aa) the school prevented the parent from providing such notice;

(bb) the parents had not received notice, pursuant to section 1415 of this title, of the notice requirement in clause (iii)(I); or

(cc) compliance with clause (iii)(I) would likely result in physical harm to the child; and

(II) may, in the discretion of a court or a hearing officer, not be reduced or denied for failure to provide such notice if—

(aa) the parent is illiterate or cannot write in English; or

(bb) compliance with clause (iii)(I) would likely result in serious emotional harm to the child.

P.L. 108–446, § 612. The effective date of this revision was July 1, 2005. P.L. 108–446, § 302(a)(1). No significant changes were made to § 1412(a)(10)(C)(iii).

In January 2005, Parents unilaterally transferred E.H. from the District to an out-of-state private facility. It was not until September 8, 2005, that Parents gave the District formal notice that Parents were dissatisfied with the District's IEP for E.H., intended to move E.H. to a private facility, and wanted the District to fund that placement. Parents explain they had been unaware they could request reimbursement from the District.

The ALJ accepted Parents' explanation. The ALJ also found that the District had known Parents were considering removing E.H. from the District and at least some of the reasons, albeit the parties dispute the proper characterization and legal significance of those reasons. The ALJ ruled that Parents should receive full reimbursement for the period after September 18, 2005, ten calendar (not business) days after Parents gave formal notice to the District.

For the period prior to September 18, 2005, the ALJ exercised what he perceived

to be his discretion under 20 U.S.C. § 1412(a)(10)(C)(iii). The ALJ reduced but did not entirely deny reimbursement, awarding Plaintiffs half of the expenses the ALJ determined were otherwise eligible for reimbursement.

The Magistrate Judge concluded that, as a matter of law, Parents' failure to give notice to the school of the intent to seek private placement "at the most recent IEP meeting that the parents attended prior to removal of the child from the public school" or by written notice ten business days prior to unilateral removal and private placement, bars Parents from seeking reimbursement from the District whether for the period before or after September 8, 2005. Parents could not cure their earlier failure to give notice, nor did the ALJ have any discretion to excuse Parents' failure to give notice. The second R & R therefore recommends that this court reverse the decision of the ALJ and deny reimbursement entirely.

Aided by Ninth Circuit authority postdating the R & R, I arrive at a slightly different interpretation of the applicable law, though it does not alter the final result. To simplify the analysis, unless otherwise noted, I will refer to the version of § 1412(a)(10)(C) that took effect in July 2005. The result would be the same under the earlier version, hence it is not necessary to decide which version governs the events here.

The parties dispute whether denial of reimbursement is mandatory except in the few circumstances enumerated in § 1412(a)(10)(C)(iv). No party cites to any controlling caselaw.

Section 1412(a)(10)(C)(iii) provides that "[t]he cost of reimbursement described in clause (ii) may be reduced or denied" if certain specified events occur (or do not occur). Use of the word "may" rather than "shall" denotes that this denial or reduction is discretionary.

The words "reduced or denied" also signify discretion. Congress did not prescribe whether reimbursement is to be denied entirely or just reduced and, if reduced, by what amount. Rather, if the parents failed to comply with the notice requirement, the state hearing officer or reviewing court may fashion an equitable result after considering all the circumstances. That Congress left some discretion to the decisionmaker is understandable, given the remedial purpose of the IDEA and myriad of factual circumstances that arise under the IDEA. Congress could not foresee and prescribe a rule for every situation, and did not attempt to do so. This element of discretion is consistent with other provisions of the IDEA. *Cf.* 20 U.S.C. § 1415(i)(2)(C)(iii) (authorizing the court to "grant such relief as the court determines is appropriate").

The District relies on the short list of "exceptions" enumerated in § 1412(a)(10)(C)(iv). Three are mandatory. Reimbursement "shall not be reduced or denied" if those circumstances are present. § 1412(a)(10)(C)(iv)(I). Congress thus created a general rule that reduction or denial is discretionary, § 1412(a)(10)(C)(iii), but forbid reduction or denial in those three circumstances.

Prior to the 2004 amendments (which took effect July 1, 2005), § 1412(a)(10)(C)(iv) also provided that reimbursement "may not be reduced or denied for failure to provide such notice" if "(I) the parent is illiterate and cannot write in English; [or] (II) compliance [with the notice requirement] would likely result in physical or serious harm to the child[.]" As a matter of law, if that circumstance applied, reimbursement could not be reduced or denied for failure to comply with the notice requirement.

The 2004 amendments to § 1412(a)(10)(C)(iv) eliminated the abso-

lute prohibition on reducing or denying reimbursement in those two specific circumstances, making such adjustments discretionary instead.[6] The District contends that, by implication, denial of reimbursement is mandatory in all other circumstances. The District is incorrect. Congress merely conferred discretion in certain additional circumstances where, prior to the amendments, reimbursement could not be denied.

Had Congress intended to confer discretion only in those three narrow circumstances, it would have said so. The interpretation urged by the District renders superfluous much of the remaining language in § 1412(a)(10)(C)(iii) and (iv). *Cf. Duncan v. Walker*, 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("This Court's duty to give effect, where possible, to every word of a statute makes the Court reluctant to treat statutory terms as surplusage") (internal citation omitted).

The District posits that reimbursement *must* be denied or reduced unless a circumstance in § 1412(a)(10)(C)(iv) applies, but § 1412(a)(10)(C)(iii) and (iv)(II) both provide that reimbursement "may" be reduced or denied if notice was not given. That also leaves discretion to reduce rather than to deny reimbursement. The ALJ did just that, giving Parents only half the amount he decided they otherwise were entitled to for the period prior to September 18, 2005.

*Greenland School Dist. v. Amy N.*, 358 F.3d 150 (1st Cir.2004), is not on point. The student in *Greenland* never received special educations services while in the public school system. E.H. did. In addition, the Ninth Circuit recently declined to follow *Greenland. Forest Grove*, 523 F.3d at 1088.

## B. Whether, as a Discretionary Matter, The Claim for Reimbursement Should be Denied for Failure to Give Notice

■ Although § 1412(a)(10)(C) does not categorically prohibit awarding reimbursement to Parents due to their failure to comply with the notice requirement, I conclude the facts of this particular case do not warrant allowing any reimbursement.

"Residential" facilities tend to be very expensive. Much of the cost may be devoted to medical (including psychological) care, room and board, and other expenses apart from education.

■ Congress had good reason for including a notice requirement in the IDEA. Before a public school district becomes liable under the IDEA for a costly private residential facility, the district deserves one last chance to address or remedy any perceived adequacies in the design or implementation of the child's IEP.

That did not occur here. Parents did not dispute the September 2004 IEP, but approved it. When Parents decided it was either desirable or necessary to keep E.H. home, the District cooperated by sending a tutor to the home. Thereafter, Parents sought nothing more from the District. In January 2005, Parents unilaterally transferred E.H. to a private facility. Nearly eight months then passed without Parents formally notifying the District of any perceived deficiencies in the IEP or the education the District had offered E.H., or telling the District Parents expected to be reimbursed for the cost of that private facility. The ALJ found that Parents had received a 23–page pamphlet from the District explaining their rights and obligations under the IDEA, including the notice requirement.

---

**6.** Congress also made several revisions not applicable here. For instance, "illiterate and

cannot write in English" became "illiterate or cannot write in English."

That the District knew E.H. was having problems, or knew Parents intended to transfer E.H. to a private residential facility, is not enough. The statute requires notice to the District "that [the parents] were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense...." § 1412(a)(10)(C)(iii)(I).

Parents concede that when they removed E.H. from public school, they had no expectation of asking the District to pay for the private residential program. The transfer was something Parents did on their own, just as when they had taken E.H. to the doctor or a hospital. That Parents didn't give notice is understandable. E.H. was not transferred to a residential facility because of educational deficiencies but for medical reasons.[7] During at least the first six months, E.H. was in no condition to devote much time or effort to schoolwork.

Parents have not demonstrated that the equities warrant waiving the notice requirement in this instance by awarding them full or even partial reimbursement.

Parents did give notice on September 8, 2005, and they did thereafter participate in an IEP meeting in December 2005. By then, however, E.H. had already been at the private facility for nearly a year, and Parents were not about to transfer E.H.

back to the public school system. Accordingly, the failure to give notice taints not only the claim for retroactive reimbursement, but also the claim for prospective reimbursement, the new IEP offer notwithstanding.

These are very hard cases. When a child encounters serious problems in life, as E.H. did, parents naturally want to do everything they can for the child. However, the IDEA does not cover every problem that a child may have. The purpose of the statute is much narrower.[8]

Therefore, I reverse the decision of the Administrative Law Judge granting partial reimbursement for the period from January 24, 2005 through September 18, 2005, and full reimbursement thereafter. Parents are entitled to no reimbursement.

### C. Motion for "Interim Relief"

■■■ Parents have filed what they style as a "Motion for Interim Relief," but it is a most unusual motion. In IDEA cases, a school district is required to fund the child's "current placement" during the pendency of any administrative or judicial proceeding under the IDEA (unless the parties mutually agree to a different placement). *See Ashland School Dist. v. V.M.*, 494 F.Supp.2d 1180 (D.Or.2007); 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a). The "stay-put" requirements establish, "in effect, an automatic preliminary injunction." *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d

---

**7.** *Cf. Clovis Unified Sch. Dist. v. California Office of Administrative Hearings*, 903 F.2d 635, 643 (9th Cir.1990) ("our analysis must focus on whether Michelle's placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process.")

**8.** The IDEA was enacted "in response to Congress' perception that a majority of handi-

capped children in the United States were either totally excluded from schools or sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" *Rowley*, 458 U.S. at 179, 102 S.Ct. 3034 (internal citation and punctuation omitted). The IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education ... designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d)(1)(A).

Cir.1982). "The stay-put provisions strive to ensure the child is not treated as a ping-pong ball, ricocheting between placements with each new ruling in the dispute between parents and school. Unlike the usual standards for awarding interim relief, [in a stay-put order] the court does not even inquire whether the moving party is likely to prevail in this action." *V.M.*, 494 F.Supp.2d at 1182.

■ When a state administrative proceeding has resulted in a determination that the proper placement is a private facility, the district must fund the private placement commencing from the date of the administrative decision and continuing throughout the pendency of the litigation. *See* 34 C.F.R. § 300.518(a), (d); *Clovis Unified School Dist. v. California Office of Admin. Hearings*, 903 F.2d 635, 641 (9th Cir.1990); *Susquenita School Dist. v. Raelee S.*, 96 F.3d 78, 85–86 (3d Cir.1996).

The Ninth Circuit has stated that a school district may not recover payments made pursuant to the stay-put requirements even if the district ultimately prevails in the litigation. *Clovis*, 903 F.2d at 641 (school district must pay those costs "regardless of which party prevails in this appeal"). A school district thus runs a serious risk of winning the battle but losing the war, at least from a financial standpoint. Indeed, that is the situation here, notwithstanding my determination that Parents are entitled to no reimbursement.

■ Parents' motion here seeks to add a new dimension to the stay-put requirements. Parents argue that the adminis-

trative proceedings took too long. Had the ALJ issued a decision sooner, Parents reason, the "date of the administrative decision" triggering the stay-put obligation would be sooner as well. Therefore, Parents argue, they are entitled to the benefits of the stay-put requirements commencing when, in Parents' view, a decision ought to have been issued by the ALJ.[9] The administrative decision was entered on January 2, 2007. Parents contend the ALJ should have acted by June 12, 2006.

In support of this theory, Parents rely primarily on several decisions arising from New York and New Jersey. Those cases are sufficiently similar to each other that I discuss only one. In *Mackey v. Board of Educ. for Arlington Central School Dist.*, 386 F.3d 158 (2d Cir.2004), the parents removed their child from public school, placed him at a private facility, and then sought reimbursement. The state utilized a two-tier administrative process. At the first level, the agency ruled against the parents on their claim for reimbursement for the 1999–2000 school year. At the second level, the parents prevailed and were reimbursed for 1999–2000. In the meantime, the parents also had sought reimbursement for 2000–2001. They were unsuccessful at both administrative levels, and also in the district court. At every step, it was determined that the IBP offered by the public school for 2000–2001 had been appropriate, and the parents were not entitled to reimbursement for the private placement.

On appeal, the published opinion[10] by the Second Circuit did not address the

**9.** The claim is not mooted by my decision on the merits. Parents contend they are entitled to these stay-put payments regardless of the ultimate outcome of this case.

**10.** On the same day, the Second Circuit filed an unpublished memorandum disposition which held that "the IEP was adequate to afford Thomas a free appropriate public edu-

cation.... [T]he District sustained its burden of demonstrating that the IEP was reasonably calculated to deliver educational benefits to Thomas.... [T]he district court properly granted summary judgment to the District on the IEP inadequacy claim." *Mackey v. Board of Educ. for Arlington Central School Dist.*, 112 Fed.Appx. 89 (2d Cir.2004).

merits of the IEP or whether the child actually was denied a free appropriate public education, focusing instead on the stay-put regulation. The administrative decision authorizing reimbursement for 1999–2000 was issued in November 2001. The panel reasoned that if that administrative decision had been issued during the 2000–2001 school year, the stay-put provision would have required the school district to fund the child's private placement during the pendency of the proceedings in which the parents unsuccessfully sought reimbursement for 2000–2001. That the parents' claim for 2000–2001 was determined to be meritless at every level of review, and the parents never were entitled to reimbursement for 2000–2001, was considered beside the point. The parents were deprived of the stay-put payments they might have received if the decision in the first administrative proceeding had been issued sooner. In the panel's view, this allowed the school district "to escape the financial consequences of pendency placement for which the District otherwise would have been responsible." *Id.* at 164. "We think such an outcome, if permitted to stand, is unfair to the parents." *Id.*

▆▆ The difficulty with the approach in *Mackey* is that it transforms a windfall— or an effort to preserve the status quo— into an entitlement. *Mackey* also flies in the face of the Supreme Court's admonition that "parents who unilaterally change their child's placement ... without the consent of state or local school officials, do so at their own financial risk." *School Comm. of Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 373–74, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

The timing of the decision in the underlying administrative proceeding, that is now on appeal before this court, does not affect Parents' right, if there is any, to reimbursement if they prevail in this litigation. What potentially would be affected is the size of the windfall Parents receive if they ultimately lose this litigation, but— because of the stay-put provision—the District has paid the costs for E.H. to remain at the private facility during the pendency of these proceedings. Even in that circumstance, Parents do not necessarily lose out. The window during which Parents receive stay-put benefits has shifted a few months, but it remains open. To the extent the administrative decision was delayed, this litigation commenced and likely will end that much later, thereby extending the "pendency of these proceedings" for purposes of the stay-put rule.

Prompt resolution of the administrative proceeding is in the best interest of the child, and is strongly preferred or even required. *See* 20 U.S.C. § 1415(c), (f); 34 C.F.R. § 300.515; OAR 581–015–2375 (2008). A prompt decision can also help to minimize financial risk for the parents. However, parents assume a risk when they unilaterally remove a child from an existing placement, as occurred here. I need not decide whether *Mackey*'s expansion of the stay-put doctrine could ever be appropriate in a case with different facts. It certainly is not appropriate here.

I also find that the underlying administrative decision was not unreasonably delayed. It was a hard fought case. The parties inundated the ALJ with a blizzard of opening briefs, closing briefs, supplemental briefs, motions, letter-motions, requests for reconsideration, e-mail, exhibits, objections, offers of proof, and other documents. The record of those administrative proceedings now fills many volumes in my chambers. Parents generated no small portion of that paperwork. The ALJ decided each issue in a timely fashion. The ALJ heard three days of testimony in April 2006. Post-hearing briefs were then filed. On May 31, 2006, at Parents' request, the ALJ reversed an earlier ruling

on a crucial legal issue, and reopened the proceedings. The parties then debated how best to proceed. Following a few delays occasioned by scheduling problems (including a month during which Parents' counsel was unavailable), an additional 286 pages of testimony were heard, which then had to be transcribed. That was followed by more briefing from the parties. The final brief on the merits was filed December 11, 2006. The ALJ filed his decision on January 2, 2007.

Parents also rely on certain language in *former* 34 C.F.R. § 30.511 (1999), which was superseded while the administrative proceeding was pending. I am not persuaded by Parents' argument. Parents expressly waived the 45-day timeline, and they share responsibility for the length of the proceedings. Regardless of whether the ALJ ought to have made specific findings and extensions justifying each interval beyond the original 45 day period—as Parents contend—any alleged technical violation by the ALJ in this instance does not warrant granting the interim relief that Parents seek from the District.

### Conclusion

The Report and Recommendation (# 30) is adopted as modified herein. The decision of the Administrative Law Judge awarding reimbursement to Parents is reversed. Parent's Motion (# 8) for Interim Relief is denied.

IT IS SO ORDERED.